# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-1851V
UNPUBLISHED

| | |
|---|---|
| WILLIAM BAYLEY,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: March 7, 2024 |

*Nicholas C. Deets*, Hovde Dassow & Deets, LLC, Indianapolis, IN, for Petitioner.

*Neil Bhargava*, U.S. Department of Justice, Washington, DC, for Respondent.

## **DECISION AWARDING DAMAGES**[1]

On September 14, 2021, William Bayley filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he developed Guillain-Barré syndrome ("GBS") as a result of receiving an influenza ("flu") on January 27, 2020. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. Although entitlement was conceded, the parties could not agree on all damages components, so the matter was designated for SPU "Motions Day," and argument was heard on January 29, 2024.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons set forth below, and as represented during the hearing,[3] I find that Petitioner is entitled to compensation in the amount of **$192,618.30**, **representing $170,000.00 for past pain and suffering, $11,711.95 for future pain and suffering, and $10,906.35 for past unreimbursed expenses.**

## I.   Relevant Procedural History

Almost a year after the case was filed, Respondent filed his Rule 4(c) Report in July 2022 conceding that Petitioner was entitled to compensation. Respondent's Report at 1. ECF No. 24. In view of Respondent's position, a Ruling on Entitlement was entered in Petitioner's favor. ECF No. 25. Thereafter, the parties attempted to informally resolve the issue of damages but reached an impasse on an appropriate award. ECF No. 28. I indicated to the parties that I would resolve their dispute as to damages via a hearing, which was held on January 29, 2024.[4]

The parties argued for damages based on briefing completed prior to the motions hearing. Thus, on October 31, 2022, Petitioner filed a damages brief requesting that I award (a) $200,000.00 for past pain and suffering, (b) $1,000.00 per year for future pain and suffering, (c) $10.906.35 for unreimbursable expenses; and (d) $35,373.90 in lost income. Petitioner's Damages Brief ("Brief") at 7, 21. ECF No. 31.

On December 19, 2022, Respondent filed a damages brief alternatively proposing the lesser award of $140,000.00 for Petitioner's actual pain and suffering, $414.85 for his unreimbursable expenses, and no award for future pain and suffering or lost income. Respondent's Damages Brief ("Opp.") at 1, 17, 19-21. ECF No. 33. Petitioner filed his reply on January 17, 2023. ECF No. 36.

## II.   Pain and Suffering

### A. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include an award "[f]or actual and projected pain and suffering, and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined

---

[3] *See* Minute Entry dated January 29, 2024. The transcript of this hearing, which was not yet filed as of the date of this Decision, is hereby incorporated into this Damages Decision by reference.

[4] *See* Hearing Order, filed December 18, 2023 (Non-PDF).

2

to be reasonably necessary." Section 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no precise formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in each case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, a special master may rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

### B. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole, including the medical records and affidavits, written briefs, and argument at the January 29th Motions Day hearing. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and rely upon my experience adjudicating these cases. Based

3

upon the above, I note and find the following:

- Petitioner received the flu vaccine at Indiana University Arnett Family Physicians ("IU") on January 27, 2020. Ex. 6 at 42-44.

- At the time of vaccination, Petitioner was employed as a heavy equipment operator with Tempest Homes. Ex. 18 at 1. He was 51 years old. Ex. 1 at 1.

- On February 12, 2020 (16 days post-vaccination), Petitioner called IU. Ex. 6 at 77. The notes documenting this call indicate that three days prior, Petitioner "started feeling what he thinks is a 'neuropathy' in his hands/feet [as well as] prickly numbness in his feet and from his elbows down.'" *Id.*

- On February 14, 2020, Petitioner again called IU and reported that his whole body felt numb and that he had to use a cane to walk. Ex. 6 at 78. He was instructed to go to the emergency room for a complete work-up. *Id.*

- Later on February 14, 2020, Petitioner reported to IU's emergency department with complaints of body aches, weakness, "numbness that has occurred diffusely throughout his body . . . [and] throat restriction sensation, especially when he coughs." Ex. 2 at 75. Petitioner was diagnosed with acute ataxia and was admitted for further testing. *Id.* at 78. *See also id.* at 428-430 (February 14, 2020 admission note).

- Also on February 14, 2020, Petitioner was evaluated by Dr. Alex Ellison. Ex. 2 at 432. He noted that Petitioner had tingling in his feet bilaterally which progressed up his legs and into his hands. *Id.* Dr. Ellison suspected a diagnosis of GBS and ordered IVIG treatment and additional testing. *Id.* at 433-434.

- Petitioner was diagnosed with GBS from the vaccination during his February 14, 2020 admission after undergoing a lumbar puncture. Ex. 2 at 440, 442, 444, 446**.** He was started on IVIG and received five courses. *Id.*

- Petitioner was discharged to Lafayette Regional Rehabilitation Hospital on February 20, 2020. Ex. 3 at 12. The plan was for three hours of rehabilitation five days per week to include physical therapy for increased strengthening and range of motion, endurance and mobility, occupational therapy for activities of daily living, transfers, speech language pathology for swallowing and cognition, and 24-hour rehabilitation nursing for bowel, bladder and skin care. Ex. 3 at 207.

- Petitioner was evaluated by Dr. Nathaniel Zuziak on February 21, 2020. Ex. 3 at

213. His medical notes reflect that Petitioner's pain was "more consistent with neuropathic pain secondary to GBS" and recommended transitioning Petitioner from opioid therapy to Neurontin (gabapentin). *Id.*

- By February 23, 2020, Petitioner was able to walk 470 feet with a two-wheeled walker. Ex. 3 at 171. By March 1, 2020, Petitioner's physical therapist noted that Petitioner denied any sensory impairment and tolerated a regular diet. *Id.* at 74, 147.

- Petitioner was discharged from Lafayette Regional Rehabilitation Hospital on March 5, 2020. Ex. 3 at 177-180. The discharge note indicates that Petitioner was diagnosed with GBS secondary to the flu vaccine. *Id.* at 177. The note further reflects that he was walking 310 feet with a two-wheeled walker, was able to climb 12 six-inch steps with bilateral handrails and was moderately independent with a two-wheeled walker for all transfers. *Id.* at 179. Petitioner was also noted to be able to independently groom and use the bathroom. *Id.* Petitioner showed "[d]iminished sensation to light touch of the left upper and bilateral lower extremities distally" and strength of 4/5 throughout. *Id.* A list of Petitioner's discharge medications indicate that he was directed to take gabapentin four times daily. *Id.*

- Petitioner saw Dr. Hongkui Jing, an IU neurologist, on March 17, 2020. Ex. 4 at 6-9. Dr. Jing's medical note indicates that although Petitioner reported improvement in strength, he had "some weakness in the bilateral upper and lower extremities" as well as generalized pain he described as a buzzing sensation. *Id.* at 6. Petitioner was instructed to continue taking gabapentin four times daily. *Id.* at 8. Dr. Jing opined that although Petitioner's symptoms may slowly improve over the next several months to years, "[h]e may have permanent residual symptoms." *Id.*

- On May 26, 2020, Petitioner saw Dr. Peter J. Hillsamer at Lafayette Otolaryngology for "evaluation of globus noticed in the throat" that "began [at] the same time he was diagnosed with [GBS]." Ex. 11 at 2-5. Petitioner described this symptom as "a lump in the throat . . . mild-moderate in severity." *Id.* at 2.

- During a virtual medical appointment with Dr. Jing on June 23, 2020, Petitioner reported that his leg pain was less severe and that he was able to walk with a cane. Ex. 4 at 10. He also noted that his leg edema was getting better and desired to return to work on a part-time schedule. *Id.*

- Petitioner attended a follow-up appointment with Dr. Hillsamer on July 30, 2020. Ex. 11 at 6-9. The medical note indicates that Petitioner's symptoms were

5

"essentially the same with a difficulty swallowing associated with [GBS]." *Id.* at 6. Dr. Hillsamer recommended an esophagram/video swallow study as well as speech therapy and a swallowing evaluation. *Id.*

- On August 11, 2020, Petitioner underwent a swallowing study. Ex. 11 at 14-16. As a result, Petitioner was assessed with "[v]ery mild oral dysphagia characterized by decreased bolus control and containment, and reduced propulsion." *Id.* at 15. It was unclear if Petitioner's condition was related to weakness or learned behavior. *Id.*

- Petitioner underwent an esophagram on August 18, 2020. Ex. 11 at 17. It revealed "[s]ubtle mucosal irregularity of the distalmost esophagus" possibly due to esophagitis. *Id.*

- On four separate occasions between August 18 and September 14, 2020, Petitioner followed up with a speech language pathologist at Purdue to address his globus sensation/muscle tension dysphagia. Ex. 11 at 19-31. At the time of his discharge on September 14, 2020, Petitioner had met all speech pathology goals. *Id.* at 29.

- On September 18, 2020, Petitioner attended a follow-up appointment with Ashly Gray, a nurse practitioner ("NP"). Ex. 12 at 7-10. Although he reported feeling 80% improved, Petitioner shared that he continued to experience a buzzing sensation and that his stamina and strength remained diminished. *Id.* at 7. He also noted that he planned to resume working on a full-time basis with modified job responsibilities. *Id.* NP Gray recommended that Petitioner participate in physical therapy. *Id.* at 9.

- Petitioner returned to NP Gray on November 17, 2020 and reported that he was unable to attend physical therapy due to the COVID pandemic. Ex. 12 at 11-12. He further reported that although he was performing physical activity at work, the neuropathy in his arms now felt like a "hum" instead of a buzzing sensation. *Id.* at 11. An examination revealed absent reflexes and 4+/5 strength with a normal gait. *Id.* at 11-12.

- On November 30, 2020, Petitioner returned to Dr. Hillsamer for a follow-up appointment concerning his dysphasia and globus. Ex. 11 at 10-13. He reported "great improvement" with medical management and speech-language pathology. *Id.* at 10.

- On February 24, 2021, Petitioner reported a continuation of "buzzing" or

6

"humming" in his upper and lower extremities to NP Gray. Ex. 12 at 13. He also indicated that he "[was] not as strong as he used to be, but does not feel weak. Stamina is still not great, but not worse." *Id.*

- Petitioner again saw NP Gray on May 17, 2021. Ex. 13 at 2-3. He reported the continuation of a buzzing sensation and complained that "his feet are the worse." *Id.* at 2. Petitioner further shared that he experienced daily sensations (lasting 10-15 seconds) of his legs "giving out." *Id.*

- Petitioner underwent an upper gastrointestinal endoscopy for dysphagia and suspected gastroesophageal reflux disease ("GERD") on May 27, 2021. Ex. 13 at 24-26. The findings included a two-centimeter hiatal hernia, a non-obstructing Schatzki ring, non-severe esophagitis, and erythematous mucosa of the stomach. *Id.* at 25.

- On October 11, 2021, Petitioner saw NP Megan Goodwin regarding his GBS diagnosis. Ex. 13 at 37-43. He reported "doing the same as he [had] been – no worse" as well as "buzzing" or "tuning fork" sensations throughout his body. *Id.* at 37. While Petitioner again noted that his feet were the most bothersome, he explained that they were "[n]ot really painful as much as irritating." *Id.* On exam, Petitioner was found to exhibit slight grip weakness in both hands with "some improvement in reflexes." *Id.* at 38. Petitioner was instructed to continue taking gabapentin. *Id.* at 39.

- At the request of Petitioner's counsel, on October 14, 2021, Dr. Robert Gregori completed an Independent Medical Examination ("IME") of Petitioner. Ex. 8. The resulting report reflects that although Petitioner "responded to IVIG and had significant motor return," he also experienced "persistent sensory impairments, including neuropathic pains . . . and mild distal weakness affecting the grip and the ankle strength. He fatigues easily." *Id.* at 8. Dr. Gregori also found that while Petitioner "regained the ability to ambulate without a device, he is at increased risk for falling given the persistent mild weakness and sensory changes affecting balance." *Id.* Dr. Gregori's impression was that Petitioner's persistent neurological symptoms were caused by his GBS and were likely permanent. *Id.* at 8. Further, he noted that Petitioner's globus symptoms were only possibly related to GBS, but that his esophagitis and chronic rhinitis also contributed to this condition as well as his swallowing issues. Id.

- Petitioner underwent an initial physical therapy evaluation at Lafayette Regional Hospital on October 18, 2021. Ex. 16 at 99-103. The initial evaluation reflects that Petitioner lived in a 2-story home with multiple steps "but no difficulty reported by

7

[Petitioner]." *Id.* at 99. It was further noted that Petitioner "demonstrated significant weakness in both [l]ower extremity extensors, hip abductors, adductors, muscle fatigue." *Id.* at 102.

- A November 29, 2021 physical therapy note reflects that Petitioner continued to experience "some weakness" in his upper extremities, with improved functional ability "at various level surface." Ex. 16 at 56. He continued to report issues with numbness and tingling. *Id.*

- Petitioner was discharged from physical therapy on December 27, 2021, having a attended a total of 17 sessions.  Ex. 16 at 56-58; 60-98. The discharge summary reflects that although Petitioner was able to walk independently, he continued to suffer from numbness and tingling and was unable to wear socks or gloves for very long due to nerve irritation. *Id.* at 62. Petitioner's fatigue and a lack of coordination were also noted. *Id.*

- Petitioner saw Dr. Jing on March 14, 2022. Ex. 13 at 44-47. Petitioner reported that "his leg falls asleep" when seated, described mild tingling in his anterior feet, and complained of trembling fingertips. *Id.* at 44, 46. On exam, Petitioner demonstrated normal strength in his upper and lower extremities, normal sensation to light touch, a normal gait, and 1+ reflexes in his bilateral upper and lower extremities. *Id.* at 45. Dr. Jing opined that Petitioner's residual symptoms were most likely permanent and recommended that Petitioner continue to take gabapentin four times daily. *Id.* at 47.

- On June 3, 2022, Petitioner's employer, Tempest Homes, submitted a letter indicating that Petitioner "was off work" for approximately seven months "due to a reaction to a flu vaccination." Ex. 14. It was further noted that while Tempest Homes continued to match Petitioner's 401K contributions and pay both his full salary and cost of maintaining health insurance, Petitioner was informed that these payments (totaling $35,373.90) "were to be considered a loan in the event he made any recovery as a result of any claims related to the flu vaccination." *Id.*

- In Petitioner's October 31, 2022 affidavit, Petitioner avers that he "continue[s] to have constant pain, nerve irritation and physical limitations with stamina and coordination." Ex. 18 at 4. Petitioner also states that he "continue[s] to experience a buzzing sensation" and suffers from "dead spots" in his feet and fingertips. *Id.* Petitioner additionally states that although he loved working as a heavy equipment operator, he is unable to perform the duties associated with this position "[d]ue to the vibration of the equipment and problems with stamina." *Id.* at 5.

8

Petitioner's medical records and affidavits provide a credible description of the pain he experienced throughout the duration of his injury. Petitioner asserts that he "suffered a serious case of GBS" and that he was forced to endure a six-day period of hospitalization, five IVIG treatments, one lumbar puncture, a twelve-day period of in-patient rehabilitation, and seventeen sessions of outpatient physical therapy. Reply at 2. Petitioner also notes that he continued to experience "serious deficits . . . almost 20 months after his GBS diagnosis," is unable to return to work as a heavy equipment operator and will remain on gabapentin for the rest of his life." *Id.* at 3. Petitioner argues that an award of $200,000.00 for past pain and suffering, and $1,000.00 per year for future pain and suffering is appropriate in this case.

Respondent, on the other hand, argues that "[P]etitioner's [treatment] course was less severe than many other cases involving GBS," that he was largely recovered by March 14, 2022 (a little over two years post-vaccination), and that "the record as a whole does not document any significant ongoing sequelae of GBS." Response at 12. As a result, Respondent proposes an award of only $140,000.00.

After reviewing the record in this case and considering the parties' arguments, I find that Petitioner's condition, while serious, falls on the moderate end of severity for GBS cases. Petitioner was diagnosed promptly, spent a relatively short period of time in both the hospital and in in-patient rehabilitation, and generally described his pain as a buzzing or humming sensation. Despite his residual symptoms (which included a decrease in strength and stamina), Petitioner was able to return to work on a part-time basis after four months and was working on a full-time basis almost four months later.

Nevertheless, several factors also justify awarding a future pain and suffering component in this case. Petitioner has established, through reference to actual records, that he will continue to suffer from lingering sequelae and will likely remain on neuropathic pain relievers for the foreseeable future. I also note that while Petitioner continues to work for the same employer, he has been required to take a different position with different responsibilities.

Although the comparable damages determinations from other cases offered by Respondent were reasonable, I find *Dillenbeck v. Sec'y of Health & Hum. Servs.*, No. 17-0428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019) – cited by Petitioner, and a case I decided – to be the most helpful. In that case, the petitioner was awarded $170,000.00 for past pain and suffering and $500.00 per year for future pain and suffering. Ms. Dillenbeck was hospitalized for approximately two weeks and, following her release from the hospital, required live-in care for five to six months thereafter. *Id.* at *3. She received multiple rounds of IVIG treatment during hospitalization and attended outpatient physical therapy two to three times per week. *Id.* She attended and was

9

discharged from outpatient physical therapy by the end of January 2016. *Id.* Ms. Dillenbeck returned to work on March 1, 2016, approximately three months after her hospitalization, though with a fifteen-pound weight restriction. *Id.* And, in April 2016, Ms. Dillenbeck requested to be free of work restrictions despite still reporting symptoms of paresthesia in hands and feet, chest sensitivity, and an unsteady gait. *Id.* At the time of her testimony in February 2019, Ms. Dillenbeck still reported GBS sequalae, including lack of sensation in hands and feels, increased sensitivity of her chest, abdomen, and back, weakness in her hands, and generalized fatigue, and she continued to take prednisone for GBS sequalae. *Id.* at *3-4. Although the facts of Ms. Dillenbeck's case present a slightly varied course of treatment, both she and Petitioner each suffered moderate GBS injuries, were forced to endure months of treatment, and will continue to suffer from ongoing deficiencies.

Accordingly, after taking into account the severity and duration of Petitioner's injury along with the personal hardships he experienced as a result, and after considering the arguments presented by both parties at the hearing, a review of the relevant caselaw and the written record, I find that $170,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.

I shall also award $500.00 per year for future pain and suffering – which, accepting Petitioner's calculation over a 28-year period,[5] comes out to $14,000.00. In keeping with Vaccine Program Practice, I must next reduce this figure to its net present value. *See* Section 15(f)(4)(A) (requiring that future compensation awards be reduced to their net present value). The Supreme Court in *Jones & Laughlin Steel Corp.* noted that the "net discount method" should ordinarily be used in choosing a proper discount rate. *Childers v. Sec'y of Health & Human Servs.*, No. 96-194V, 1999 WL 218893, at *19 (Fed. Cl. Spec. Mstr. Mar. 26, 1999) (citing *Jones*, 462 U.S. 523, 538-50 (1983)). That same net discount method has been commonly utilized in other special master's decisions. *See, e.g., Brown v. Sec'y of Health & Human Servs.*, No. 00-0182V, 2005 WL 2659073, at *9-10 (Fed. Cl. Sept. 21, 2005). Net discount rates utilized by other special masters have ranged from one percent to three percent, a somewhat higher range than that utilized by non-Program cases. *See, e.g., Neiman v. Sec'y of Health & Human Servs.*, No. 15-631V, 2016 WL 7741742, at *1 (Fed. Cl. Spec. Mstr. Oct. 31, 2016) (utilizing a net discount rate of one percent for the first fifteen years of an award); *J.T. v. Sec'y of Health & Human Servs.*, No. 12-618V, 2015 WL 5954352, at *13 (Fed. Cl. Spec. Mstr. Sept. 17, 2015) (adopting the respondent's suggested net discount rate of 1.5 to 1.6 percent); *Childers*, 1999 WL 218893, at *25 (employing a two percent net discount rate).

---

[5] Petitioner's calculation of his life expectancy is based on the Centers for Disease Control and Prevention's 2019 National Vital Statistics Report. *See* U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, *National Vital Statistics Reports Vol. 70, Number 19* (March 22, 2022), available at https://www.cdc.gov/nchs/products/nvsr.htm. *See also* Brief at 19; Ex. 19. Respondent did not object to this calculation in his brief or during his argument on January 29, 2024.

Consistent with my reasoning in *Dillenbeck*, adopting a multiprong approach to account for the fluctuating treasury interest rates of present day is appropriate for determining the net discount rate in this case. *See Dillenbeck*, 2019 WL 4072069, at *15 (adopting a multi-pronged approach in order to account for the unusually low treasury interest rates of yore, utilizing a one percent net discount rate for the first fifteen years of this award, followed by a two percent net discount rate for the remaining seven years). However, while a one-to-two percent discount rate was utilized in *Dillenbeck*, Respondent notes that the interest rate has increased significantly from the historic lows seen in previous years and argues that a two-to-three percent valuation is appropriate in this case.

While I agree that the lower treasurer rates which formed the basis of the multipronged approach in *Dillenbeck* no longer exist, the current higher rates are unlikely to continue for more than a few years (and certainly not for the 28-year period covered by the future pain and suffering award). Therefore, I find that the multipronged approach properly accounts for rate fluctuations and is a more accurate reflection of the appropriate net present value. I will utilize a two percent net discount rate for the first fifteen years of the award, followed by a one percent net discount rate for the remaining thirteen years. *See Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V (Fed. Cl. Spec. Mstr. Feb. 20, 2024). Applying this multi-pronged net discount rate, Petitioner's $14,000 award for future pain and suffering will be $11,711.95.[6]

### III. Lost Wages

#### A. Legal Standard

---

[6] This figure was calculated in Microsoft Excel using the present value or "PV" function. The PV function syntax is: -PV (rate (r), number of payment periods (n), payment amount (PMT), future value (FV) (optional), and type (optional)). In other words, $PV = FV / (1+ r)^n + PMT / r [1 - 1/ (1+ r)^n]$. In this case, r = 0.02 (years 1-15) or 0.01 (years 16-28); PMT = $500.00; n = 1 (represents 1 payment period or 1 year); FV is variable, and the "type" was not used for these calculations. For the purposes of the calculation in Excel, "PV" is negative representing a cash outflow, *e.g.*, purchasing a stock, bond, or annuity and thus, an initial negative cash outlay.
Each year (28 years representing Petitioner's expected future life expectancy) was calculated separately (in an individual cell) using the same syntax, which resulted in the present value of the award for the current year, and the future value of the award for the subsequent year. The first 15 payments (or years) were calculated using a 2% discount rate, 1 payment period, $500.00 payment amount, with the future value being the value of the previous year's award. Beginning with payment/year 16, payments 16 through 28 were calculated using a 1% discount rate, 1 payment period, $500.00 payment amount, with the future value being the value of the previous year's award. For example: the syntax for Year 1 (cell B2) is "=-PV(0.02,1,500)" yielding a value of $490.20; the syntax for Year 2 (cell C2) is "=-PV(0.02,1,500,B2)" yielding a value of $970.78; the syntax for Year 16 (cell Q2) is "=- PV(0.01,1,500,P2)" yielding a value of $6,856.07; and and the syntax for Year 28 (cell AC) is "=- PV(0.01,1,500,AB2)" yielding a value of $11,711.95.

11

The Vaccine Act provides for recovery of "actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections," where the injured party's "earning capacity is or has been impaired by reason of such person's vaccine-related injury." Section 15(a)(3)(A). Compensation awarded for a petitioner's anticipated loss of earnings may not be based on speculation. *J.T.*, 2015 WL 5954352, at *7 (indicating Section 15(a)(3)(A) "does not envision that 'anticipated loss of earnings' includes speculation" and denying to calculate lost wages on a planned business venture). The United States Court of Federal Claims has "recognize[d] that the determination of compensation for lost earnings 'in accordance with generally recognized actuarial principles and projections' would likely require expert opinion evidence." *Dillenbeck v. Sec'y of Health & Hum. Servs.*, 147 Fed. Cl. 131, 139 (2020) (*citing J.T.*, 2015 WL 5954352, at *7).

### B. Lost Wages Determination

Petitioner seeks $35,373.90 to repay a loan to his employer, Tempest Homes. He asserts that during the seven-month period he was out of work, "Tempest Homes . . . continued to pay his salary and benefits as a courtesy for his long-time employment but made clear its understanding that the payments were a loan that would be reimbursed out of any recovery from his vaccine claim." Brief at 15. *See also* Ex. 14 (June 3, 2022 letter from Tempest Homes' president affirming that Petitioner was told that these courtesy payments were considered a loan "in the event he made any recovery as a result of any claims related to the flu vaccination."). Petitioner argues that this amount is "covered by Section 15(a)(3)(A) because it will be born as lost income." Reply at 10.

In addition to noting that Petitioner has not filed any documentation of an actual loan agreement he signed, Respondent contends that "[P]etitioner has not actually suffered any lost income, as his employer states that it paid [P]etitioner's full salary during the time he did not work." Response at 19. Respondent also argues that "[P]etitioner seeks recovery for his employer's claimed damages," and that Tempest Homes is trying to assert a right of subrogation. *Id.* at 19-20. Citing my General Order Regarding Subrogation,[7] Respondent concludes that "'the [Vaccine] Act does not permit third parties with an otherwise-cognizable and enforceable interest in recovering funds associated with care and treatment provided to a Program petitioner from attaching the proceeds of a Vaccine Act entitlement . . . (other than in the narrow exceptional cases set forth in the Act).'" While this prohibition specifically applies to third party insurers, it also applies to an employer who seeks to invade their employee's award of damages.

---

[7] Available at *http://www.uscfc.uscourts.gov/vaccine-guidelines.*

12

The amount extended to Petitioner from Tempest Homes does not constitute lost income as contemplated by Section 15(a)(3)(A). As Respondent noted, Petitioner was actually paid his salary, and despite both Petitioner and Tempest Homes' statements to the contrary, there is no evidence of an enforceable loan either (e.g., a written agreement that has been signed by both parties). Therefore, based on the above, Petitioner's claim for lost wages is denied.

### IV.   Award for Past Unreimbursable Expenses

Pursuant to the Vaccine Act, Petitioner is entitled to compensation for "actual unreimbursed expenses" for his vaccine-related injury which have been incurred for "medical or other remedial care determined to be reasonably necessary." Section 15(a)(1)(A).

Petitioner requests $10,906.35 in past unreimbursable expenses. Brief at 2; Ex. 18. Respondent, however, proposes only reimbursing Petitioner a total of $414.85. He argues that "the majority of [P]etitioner's reported expenses are unverified, and it is not clear which bills were actually paid." Response at 17. Indeed, at the time that Respondent's brief was filed, Petitioner primarily relied upon invoices with handwritten notations indicating that certain amounts had been paid as proof of payment. *See, e.g.*, Ex. 18 at 10. As a further example of an evidentiary deficiency, Respondent pointed to an August 2020 invoice from IU and noted that it was unclear whether this bill "(and most other bills included in Exhibit 18) is for a vaccine-related medical expense, as there is no listed date of service. It is also unknown if [it] (and most other bills included in Exhibit 18) was paid by a health insurer, [P]etitioner, or adjusted/written off." Response at 18.

Following Respondent's brief, Petitioner filed a supplemental affidavit and additional billing records that document payments he made to various medical providers. *See* Ex. 20. Despite this additional evidence, Respondent argued that it remained unclear whether the amounts paid were for vaccine-related treatment because the date of invoicing often lagged the date of service by more than six months. However, it is not uncommon for the issuance of bills to be delayed – especially in instances when a portion of the balance is covered by insurance. Therefore, I am not persuaded that a gap between the date of service and date of invoicing is fatal to Petitioner's assertion that the amounts set forth in Exhibit 20 are related to his treatment for GBS.

Upon review of the documentation presented by Petitioner and after considering the arguments at hearing, I find that all but $1,344.50 (billed by Lafayette Regional Hospital/Ernest Health) of Petitioner's request for unreimbursed expenses has been paid. *See* Ex. 20-C. During the hearing, Petitioner acknowledged that this amount remains

13

outstanding and represents unpaid co-payments for physical therapy sessions from October through December 2021. *See* Ex. 16 at 62-63. Respondent argues that because this amount remains outstanding, these expenses have not been "incurred" as required by Section 15(a)(1)(A). However, the statutory language should not be construed so narrowly. The common rule of statutory construction is that words are given their plain and ordinary meaning in the absence of any indication otherwise. *See Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (*quoting BP America Production Co. v. Burton*, 549 U.S. 84, 91 (2006)). *Black's Law Dictionary* defines the word "incur" to mean "[t]o suffer or bring on oneself (a liability or expense)." *Incur*, BLACK'S LAW DICTIONARY (11th ed.2019). *See also Quarles Petroleum Co. v. United States,* 551 F.2d 1201, 1205 (Ct.Cl. 1977) (stating that "[t]o incur means to become liable for or subject to; it does not mean to actually pay for."). Therefore, upon review of the documentation presented by Petitioner and his arguments at the hearing, I find that he is entitled to $10,906.35 in unreimbursed expenses.

## Conclusion

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $192,618.30**, (representing $170,000.00 for Petitioner's past pain and suffering, $11,711.95 for future pain and suffering, and $10,906.35 for past unreimbursable medical expenses) **in the form of a check payable to Petitioner, William Bayley.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[8]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[8] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.